FILED

SEP 0 7 2012

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

JAMIE SWENSON and        *        CIV 11-4013-RAL
RANDY STEWART,          *
                           *
      Plaintiffs,            *
                           *        OPINION AND ORDER
      vs.                   *        REGARDING SUMMARY
                           *        JUDGMENT MOTIONS
STATE FARM FIRE & CASUALTY    *
COMPANY,                  *
                           *
      Defendant.            *

## I. Introduction

This case involves an insurance coverage dispute between Plaintiffs Jamie Swenson and Randy Stewart ("Plaintiffs") and Defendant State Farm. Defendant has moved for summary judgment on all of Plaintiffs' claims. Doc. 27; Doc. 28; Doc. 29; Doc. 46. Plaintiffs oppose Defendant's motion, Doc. 43; Doc. 44, and have filed a motion for partial summary judgment of their own, seeking a determination from this Court that the policy in question covers their loss. Doc.35; Doc. 37; Doc. 38. Defendant opposes Plaintiffs' motion for partial summary judgment. Doc. 40; Doc. 42.

## II. Facts

In mid-October 2007, Plaintiffs Jamie Swenson and Randy Stewart contracted with DJ Construction to build a single-family Spanish contemporary style home at 47711 273rd Street in rural Harrisburg, South Dakota. Doc. 29 at ¶ 1; Doc. 44 at ¶ 1. Plaintiffs and DJ Construction revised and replaced the 2007 contract with a July 11, 2008 contract. Doc. 44 at ¶ 1; Doc. 30-1 at 19-23. The revised contract provided that DJ Construction would serve as the general contractor for the project at a fixed price of $1,363,952.00, subject to certain allowances and construction alternatives. Doc. 29 at ¶ 2; Doc. 44 at ¶ 2.

Construction of the home began in November 2007 and continued intermittently until the summer of 2009, when Plaintiffs discovered that, among several other problems with the house, DJ Construction and certain subcontractors had failed to adequately protect the partially constructed house from the elements during construction, which allowed melting snow and rain to intrude into the house. Doc. 29 at ¶ 3; Doc. 44 at ¶ 3; Doc. 38 at ¶ 3; Doc. 40 at ¶ 3. Following this discovery, DJ Construction stopped all work and left the home in its incomplete condition. Doc. 29 at ¶ 3; Doc. 44 at ¶ 3. Construction has not recommenced since that time and the home remains incomplete and uninhabitable. Doc. 29 at ¶ 4; Doc. 44 at ¶ 4. Plaintiffs hired Thomas J. Irmiter of Forensic Building Science, Inc. to inspect the home in the fall of 2009. Doc. 29 at ¶ 5; Doc. 44 at ¶ 5. Irmiter issued a report on December 11, 2009, in which he identified the following three categories of damage to the home:

> Category 1: Work performed to date requiring repairs or replacement.
> Category 2: On site deviation from the original plan, most of which was not authorized by the owner, to the current as-built condition which will require corrections.
> Category 3: On site construction management decisions made by the Contractor which resulted in damage to the home which may cost more to repair than to simply start over.

Doc. 29 at ¶ 6; Doc. 44 at ¶ 6.

Plaintiffs sued DJ Construction in 2009 in the Second Judicial Circuit Court, Lincoln County, South Dakota. Doc. 29 at ¶ 7; Doc. 44 at ¶ 7. In their state court complaint, Plaintiffs alleged that they "discovered various improper construction practices that were used or permitted to be used by DJ Construction and its subcontractors," including but not limited to:

> improper stucco installation; improper window installation; installation of windows that failed and leaked; improper installation of the roof; improper installation of the soffits; improper grading; improper installation of footings; improperly installed framing and

improper use of damaged framing members; improper installation
of insulation; improper installation of HVAC system components;
excessive settling of strip footing at the bearing walls in the
basement; improper sequencing of construction; failure to install
waterproofing on the exterior foundation and footings; failure to
contact building officials to schedule required inspections; and
failure to protect the basement from flooding and water damage
during construction.

Doc. 29 at ¶ 8; Doc. 44 at ¶ 8.

Plaintiffs also submitted a claim[1] to State Farm under their homeowner's policy ("Policy"),

which was in effect from July 7, 2009 to July 7, 2010.[2]  Doc. 29 at ¶ 9; Doc. 44 at ¶ 9.  Plaintiffs

claimed that rain and snow caused the water damage[3] to their home, although construction issues

---

[1] There is no dispute that Plaintiffs reported their loss in a timely manner, provided Defendant
with access to the home to investigate and adjust the loss, and cooperated with Defendant's efforts
to do the same.  Doc. 38 at ¶ 7; Doc. 40 at ¶ 7.

[2] There is nothing in the record to establish whether Defendant insured the home prior to July 7,
2009.  If Defendant was not on the risk prior to that date, there would be additional coverage issues
given that a large portion of the loss appears to have occurred before July 7, 2009.

[3] The Policy contains an exclusion for water damage, which the Policy defines as:

> (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow
> of a body of water, or spray from any of these, all whether driven by
> wind or not;
> (2) water or sewage from outside the residence premises plumbing
> system that enters through sewers or drains, or water which enters into
> and overflows from within a sump pump, sump pump well or any other
> system designed to remove subsurface water which is drained from the
> foundation area; or
> (3) water below the surface of the ground, including water which exerts
> pressure on, or seeps or leaks through a building, sidewalk, driveway,
> foundation, swimming pool or other structure.

Doc. 30-7 at 14.  The "water damage" exclusion appears not to exclude coverage under the
circumstances.

3

with the home allowed such water infiltration.

The Policy under which Plaintiffs made their claim provides that "[w]e insure for accidental direct physical loss to the property . . . except as provided in SECTION I- LOSSES NOT INSURED." Doc. 30-7 at 11.  Three paragraphs under Section I are relevant to this case.

Under paragraph 1 of Section I, the Policy states:

> 1. We do not insure for any loss to the property . . . which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
> ***
> g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown;
> ***
> i. wet or dry rot;
> ***
> However, we do insure for any resulting loss from items a. through m. unless the resulting loss is itself a Loss Not Insured by this Section.

Doc. 30-7 at 13-14. ("deterioration and wet or dry rot exclusion").

Paragraph 2 of "SECTION I-LOSSES NOT INSURED" states:

> 2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
> ***
> g. Fungus.[4] We also do not cover:

---

[4] Under the terms of the policy, "fungus" means "any type or form of fungus, including mold, mildew, mycotoxins, spores, scents or byproducts produced or released by fungi." Doc. 30-7 at 33.

1) any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the residence premises or location of the rebuilding, repair or replacement, by fungus;
2) any remediation of fungus, including the cost to:
a) remove the fungus from covered property or to repair, restore or replace that property; or
b) tear out and replace any part of the building or other property as needed to gain access to the fungus; or
3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of fungus, whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

Doc. 30-7 at 14; 33[5] ("fungus exclusion").

Finally, Paragraph 3 of "SECTION I-LOSSES NOT INSURED" contains the following

exclusion:

3. We do not insure under any coverage for any loss consisting of one or more of the items below.  Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other causes of the loss:

a. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent, or without fault;

b. defect, weakness, inadequacy, fault or unsoundness in:
(1) planning, zoning, development, surveying, siting;
(2) design, specifications, workmanship, construction, grading, compaction;
(3) materials used in construction or repair; or
(4) maintenance;
of any property (including land, structures, or improvements of any kind) whether on or off the residence premises; or

c. weather conditions

---

[5] The fungus exclusion does not appear on page 14 of Doc. 30-7, but appears on page 33, which adds the fungus exclusion to paragraph 2.

> However, we do insure for any resulting loss from items a., b., and
> c. unless the resulting loss is itself a Loss Not Insured by this
> Section.

Doc. 30-7 at 14-15 ("negligent construction exclusion").

In their claim to Defendant, Plaintiffs listed "rainwater (see attached report)" as the cause of their loss, claiming "more than $1,700,000" in damage to the home.   Doc. 29 at ¶ 9; Doc. 44 at ¶ 9.   In a September 1, 2010 letter, Defendant denied Plaintiffs' claim based on several exclusions in the policy.   Doc. 29 at ¶ 10; Doc. 44 at ¶ 10; Doc. 30-6.   On December 28, 2010, Plaintiffs filed the present action against Defendant for breach of contract and bad faith based on Defendant's denial of coverage.   Doc. 29 at ¶ 11; Doc. 44 at ¶ 11.   Plaintiffs' Complaint asserts that DJ Construction's failure to adequately protect the home from the elements during construction "allowed melting snow and rain to intrude into the [home], and caused significant water damage to the [home]," and that the policy covers this water damage.   Doc. 29 at ¶ 12; Doc. 44 at ¶ 12; Doc. 1-2 at 2.

During his deposition in Plaintiffs' state court case against DJ Construction, Plaintiffs' expert Dan Irmiter testified that the end result of the failure to protect the house from the elements during construction was fungal growth.   Doc. 29 at ¶ 18; Doc. 44 at ¶ 18; Doc. 30-8 at 4. Specifically, Irmiter explained that:

> The water that went into that lower basement froze creating
> basically a skating rink in the basement, if you will.  In order to
> take that frozen water out of there it needed to be heated.  It was
> heated with propane.  It appears that the propane tanks or the
> propane heaters that were put down there certainly did the job of
> melting everything, but it doesn't appear that there was proper
> ventilation.  There may have been some ventilation put in place,
> but there certainly wasn't ventilation sufficient to also handle the
> excess moisture that's thrown into the air from the propane.  And
> so, the excess amount of moisture in that entire—and I call it an

> assembly. That entire basement assembly we believe was kind of
> the triggering or starting point for some of the fungal growth down
> there . . . [w]e have to have a lot of water to get those spores to
> start germinating and to start growing the way they did in this
> environment.

Doc. 29 at ¶ 18; Doc. 44 at ¶ 18; Doc. 30-8 at 4. According to Irmiter, the fungal growth in the

basement transferred to the upper portion of the home through a process he called "cross-

contamination." Doc. 30-8 at 4-5. Irmiter testified that the additional water coming into the home

during the upper framing stages—which provided "additional food . . . or a food source, more

water"—"exacerbated" the cross-contamination process. Doc. 29 at ¶ 19; Doc. 44 at ¶ 19; Doc.

30-8 at 4-5.

> Charles Lane, Defendant's expert, explained:

>> The moisture leakage into the interior of the Residence was caused
>> by the failure of the General Contractor and the subcontractors to
>> properly coordinate their respective construction means, methods,
>> techniques, and sequences to control external moisture intrusion
>> into the Residence. As a result of these failures, moisture intrusion
>> into the interior of the Residence has occurred, and is continuing
>> to occur over time. As a result of this moisture intrusion atypical
>> mold growth has occurred, and is continuing to occur, throughout
>> the Residence.

Doc. 38 at ¶ 4; Doc. 40 at ¶ 4; Doc. 30-4 at 5. Lane further opined that the "extensive water

intrusion into the basement" provided "excessive moisture" that vaporized into the air causing

increased "adsorption of moisture by cellulose containing construction materials including wood

and gypsum board paper," which resulted in the "atypical mold growth in these materials." Doc.

29 at ¶ 20; Doc. 44 at ¶ 20; Doc. 30-4 at 9.

> During his deposition in the state court proceeding, Irmiter was asked about the difference

between water staining and water damage. Doc. 30-8 at 6. Irmiter testified that:

Water staining is an indication of materials that at some point in time have become wet. They could have become wet in transport. They could have become wet in storage at the lumberyard. They could have become wet on the job site. All of these, all wood-based products will go through a wetting and drying cycle. And what happens, damage begins to occur when that wood-based product no longer sheds water and the wetting cycle is longer than the drying cycle. And that happens with saturation. That's why most of the literature that you read says that 16 percent is the magical number when you're using Delmhorst moisture meters for moisture content. There's numerous studies that have been done indicating that fungal growth, which is a naturally—fungus is a naturally occurring thing. Mold is a naturally occurring thing. It's on everything. If I've got moisture over a prolonged period of time, 36 to 48 hours, higher than 16 percent, and there's mold spores on the material, fungal growth is going to start. So simply seeing something that's stained does not concern us. It's how deeply it's stained, where the stain location is, those kinds of things.

Doc. 29 at ¶ 21; Doc. 44 at ¶ 21; Doc. 30-8 at 6-7.

Irmiter testified that he had been trained to identify two types of fungus, both of which are associated with wood rot. Doc. 30-8 at 10. Irmiter explained "[o]ne is a brown rot and one is a white rot fungus." Doc. 29 at ¶ 22; Doc. 44 at ¶ 22; Doc. 30-8 at 10. During his September 9, 2009 inspection of the home, Irmiter visually identified the "water staining" on the trusses in the home as white or brown fungus. Doc. 29 at ¶ 23; Doc. 44 at ¶ 23; Doc. 30-8 at 10. Irmiter stated that "there's a bunch of aspergillus penicillin down [in the basement], the black stuff. That's pretty easy to identify." Doc. 29 at ¶ 22; Doc. 44 at ¶ 22; Doc. 30-8 at 10. Irmiter created a document entitled "Collected Truss Data" to record the information he gathered while inspecting the house. Doc. 30-9. On every truss where Irmiter noted "water damaged" components, he also visually identified the type of fungus on the component. Doc. 30-9.

The "black stuff" appearing on the wood in the pictures Irmiter took of the house and included with his report is visible mold or fungal growth. Doc. 29 at ¶ 24; Doc. 44 at ¶ 24; Doc.

8

30-10. Rather than testing every location where he visually sees mold growth, Irmiter pulled three or four representative samples and then "extrapolate[d]" that every time he saw this condition, "there's more than a 98-percent shot that there's going to be mold on there that I have to take care of." Doc. 30-8 at 8; Doc. 29 at ¶ 25; Doc. 44 at ¶ 25. Each of the ten samples Irmiter took from the home and analyzed showed the presence of fungal growth. Doc. 29 at ¶ 26; Doc. 44 at ¶ 26; Doc. 30-11.

## III. Discussion

### A. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012).

### B. South Dakota Law Concerning Insurance Contracts

In this diversity jurisdiction case, South Dakota law governs the interpretation of the Policy. See Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012) ("State law governs the interpretation of insurance policies when federal jurisdiction is based on diversity of citizenship."). In South Dakota, insurance contract interpretation is a question of law for which the Supreme Court of South Dakota has developed "special rules of construction." Cornelius v. Nat'l Cas. Co., 2012 SD 29, ¶ 6, 813 N.W.2d 167, 169 (citations omitted). "If the rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct, the policy is ambiguous. Ambiguity in an insurance policy is determined with reference to the policy as a whole and the plain meaning and effect of its words." Id., 813 N.W.2d at 169 (citations and internal quotation marks omitted). "If the provisions of an insurance policy are ambiguous [the Supreme Court of South Dakota applies] the rule of liberal construction in favor of the insured and strictly against the insurer." Id. at ¶ 6, 813 N.W.2d at 170 (citations and internal quotation marks omitted). This approach, however, does not mean that "the court may seek out a strained or unusual meaning for the benefit of the insured." Id., 813 N.W.2d at 170 (citations and internal quotation marks omitted). When, as in the present case, "an insurer invokes a contract exclusion to disallow coverage, the insurer has the burden of proving that the exclusion applies." Auto-Owners Ins. Co. v. Hansen Hous., Inc., 2000 SD 13, ¶ 10, 604 N.W.2d 504, 509 (citations and internal quotation marks omitted).

By its terms, the Policy covers "accidental direct physical loss to the property"[6] unless a particular cause of loss is excluded from coverage.  Doc. 30-7 at 9.  Plaintiffs contend that DJ Construction's failure to adequately protect the home from the elements during construction allowed melting snow and rain to intrude into the home and caused significant problems that Plaintiffs call "water damage."  Plaintiffs argue that the Policy covers this "water damage."  Defendant disputes coverage under the policy, arguing that several exclusions in the policy bar recovery for Plaintiffs' claimed loss.  Specifically, Defendant points to three exclusions:  1) the

---

[6] Defendant does not make an argument as a basis for summary judgment that Plaintiffs' claims do not involve a claim of "accidental direct physical loss to the property."  However, in a November 10, 2010 letter, outside counsel for Defendant explained why Defendant did not believe the policy to cover Plaintiffs' claims as follows:

> First, your clients have not identified a loss either in their Sworn Proof of Loss or in the FBS report which falls under the Insuring Agreement of the subject homeowner's policy.  Such policy only insures 'accidental direct physical loss' to the dwelling.  The term accident has been defined by the South Dakota Supreme Court as "an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force."  Taylor v. Imperial Cas. & Ind. Co., 82 S.D. 298, 144 N.W.2d 856 (1966).  The FBS report makes it clear that your clients' claimed damage was the result of contractor negligence which led to water intrusion which occurred over time and not "suddenly."  According to the FBS report the water intrusion occurred over a period of time from the summer of 2007 through the winter of 2008.  The FBS report indicates that due to the negligence of the contractors, water intruded into the various systems of the home due to "melting snow" and "rain and snow exposure."  There is no mention in your clients' Sworn Proof of Loss or the FBS report of any "accidental loss" as that term is defined by the South Dakota Supreme Court and, thereby, there is no coverage under the subject homeowner's policy.

Doc. 20-1 at 1-2.  The Supreme Court of South Dakota has never interpreted the phrase "accidental direct physical loss."  Plaintiffs, however, argue that they have suffered an accidental direct physical loss, Defendant does not argue otherwise at this time, and this Court does not need to address the issue further.  Doc. 37 at 5-6.

fungus exclusion, 2) the deterioration and wet or dry rot exclusion, and 3) the negligent construction exclusion. Defendant contends that Plaintiffs cannot avoid these policy exclusions by labeling their claimed loss as "water damage." To allow Plaintiffs to do so, Defendant contends, would ignore the contractor's precipitating defective workmanship and the subsequent rot and fungal growth.

## C. Applicability of Fungus Exclusion

The primary problems with Plaintiffs' home are that the water intrusion and improper remediation resulted in fungal growth and that construction was discontinued prior to completion of the home. The Policy's fungus exclusion provides that the Policy does "not insure under any coverage for any loss which would not have occurred in the absence of . . . fungus." Doc. 30-7 at 14, 33. In their brief, Plaintiffs argued that the efficient proximate cause doctrine[7] renders the fungus exclusion inapplicable. Doc. 43 at 1, 7-8. The Supreme Court of South Dakota recognized

---

[7] One insurance treatise explains the efficient proximate cause doctrine as follows:

> Some courts have chose to define the concept of proximate cause of a loss as the fundamental, efficient moving cause, i.e., the cause that is responsible for setting any and all other causes in motion. Pursuant to the interpretation of proximate cause, the efficient moving cause must be a peril insured against under the terms of the policy in order for there to be coverage.
>
> Many jurisdictions have expanded the efficient proximate cause rule into a broader doctrine. The efficient proximate cause doctrine has been applied under those circumstances in which two or more identifiable causes, at least one of which is covered under the policy and at least one of which is excluded thereunder, contribute to a single loss. If the cause which is determined to have set the chain of events in motion, the efficient proximate cause, is covered under the terms of the policy, the loss will likewise be covered. Under any circumstances, in order for the efficient proximate cause doctrine to apply there must be at least two potential causes of the subject loss.

7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 101:45 (3d. ed. 2005).

12

the efficient proximate cause doctrine in <u>Lummel v. Nat'l Fire Ins. Co.</u>, 210 N.W. 739, 742 (S.D. 1926).  "The doctrine of efficient proximate cause governs situations where a risk specifically insured against sets other causes in motion in an unbroken sequence between the insured risk and the ultimate loss.  In such situations, the insured risk is regarded as the proximate cause of the entire loss, even if the last step in the chain of causation was an excepted risk." <u>TNT Speed & Sport Ctr., Inc. v. Am. States Ins. Co.</u>, 114 F.3d 731, 733 (8th Cir. 1997) (applying Missouri law). "[I]n jurisdictions which apply the efficient proximate cause doctrine, coverage may be afforded for mold if it is determined that the efficient proximate cause of the loss is a covered 'cause of loss' such as water infiltration." 4 Philip L. Bruner & Patrick J. O'Connor, Jr., <u>Bruner & O'Connor on Construction Law</u>, § 11:236 n.4 (2012); <u>see also</u> Russ & Segalla, <u>supra</u>, § 153:86 ("In a jurisdiction that has adopted the efficient proximate cause rule, the policy provides coverage for a loss efficiently caused by a covered peril, even though other excluded perils contributed to cause the loss.").

One limit to the efficient proximate cause doctrine, however, is that it is only applied "'where two separate or distinct perils could have occurred independently of the other and caused damage.'" <u>Cain v. Fortis Ins. Co.</u>, 2005 SD 39, ¶ 25, 694 N.W.2d 709, 714 (quoting <u>Capitol Indem. Corp. v. Evolution, Inc.</u>, 293 F. Supp. 2d 1067, 1072 (D.N.D. 2003)). "When, however, the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application.  An insured may not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." <u>Chadwick v. Fire Ins. Exch.</u>, 17 Cal. App. 4th 1112, 1117 (Cal. Ct. App. 1993).

Defendant's fungus exclusion policy language, however, contains a lead-in clause referred to as an "anti-efficient proximate cause doctrine clause," or "an anticoncurrent causation provision." The lead-in clause, when read in combination with the fungus exclusion, states that the Policy does not cover any loss which would not have occurred in the absence of fungus

> regardless of (a): the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these . . . .

Doc. 30-7 at 14, 33. The Supreme Court of South Dakota has yet to consider the enforceability of such an anti-efficient proximate cause doctrine clause. See 4 David L. Leitner et al., Law and Prac. of Ins. Coverage Litig. § 52:36 (2012). When the Supreme Court of South Dakota "has not spoken on a particular issue of law," this Court "must attempt to predict what [the Supreme Court of South Dakota] would decide if it were to address the issue." Jurrens v. Hartford Life Ins. Co., 190 F.3d 919, 922 (8th Cir. 1999) (citations and internal quotation marks omitted). In doing so, this Court "may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data." Id. (citations and internal quotation marks omitted).

Under South Dakota law, "[t]he existence of the rights and obligations of parties to an insurance contract are determined by the language of the contract, which must be construed according to the plain meaning of its terms. Thus, in deciphering the language of the insurance contract, the court must employ a plain meaning approach." State Farm Fire & Cas. Co. v. Harbert, 2007 SD 107, ¶ 17, 741 N.W.2d 228, 234 (citations and internal marks omitted). The plain meaning of the fungus exclusion in the policy at issue is to eliminate application of the efficient proximate cause doctrine.

A review of the relevant case law reveals that "most courts which have addressed this issue have found that exclusionary language designed to avoid the 'efficient proximate cause' doctrine is enforceable." Assurance Co. of Am., Inc. v. Jay-Mar, Inc., 38 F. Supp. 2d 349, 354 (D.N.J. 1999) (citation omitted); see also St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co., 472 F. Supp. 2d 630, 636 (M.D. Pa. 2007) ("An anticoncurrent-cause clause defeats the operation of the efficient proximate cause rule."); Preferred Mut. Ins. Co. v. Meggison, 53 F. Supp. 2d 139, 142 (D. Mass. 1999) (explaining that the "vast majority of states" uphold "anticoncurrent causation provisions"); Russ & Segalla, supra, § 101:45 ("The majority of jurisdictions permit the parties to an insurance contract to contract out of the efficient proximate cause doctrine."); Julie A. Passa, Comment, Insurance Law-Property Insurance: Adopting the Efficient Proximate Cause Doctrine, But Saying No to Contracting Out of It, 79 N.D. L. Rev. 561, 572 (2003) ("Most courts have held that parties have the freedom to contract as they choose and therefore may contract out of the effect of the efficient proximate cause doctrine.").

In TNT Speed & Sport Ctr., Inc. v. Am. States Ins. Co., 114 F.3d 731 (8th Cir. 1997), the Eighth Circuit considered whether an anti-efficient proximate cause doctrine clause was enforceable under Missouri law. Like the Supreme Court of South Dakota, the Missouri Supreme Court had not decided whether parties could contract out of the efficient proximate cause doctrine. Id. at 733-34. The Eighth Circuit explained that, under those circumstances, "it was entirely proper for the district court to consider relevant precedents from other jurisdictions." Id. at 734. The Eighth Circuit then affirmed the district court's conclusion that the "more persuasive cases from other states recognize that the parties may contract out of application of the efficient proximate cause doctrine." Id. at 733 (citing Alf v. State Farm Fire and Cas. Co., 850 P.2d 1272, 1277 (Utah 1993) ("We believe that the proper path to follow is to recognize the efficient proximate cause rule

15

only when the parties have not chosen freely to contract out of it. As the Colorado Supreme Court stated in <u>Kane v. Royal Ins. Co. of Am.</u>, 768 P.2d 678, 685 (Colo. 1989), 'the efficient proximate cause rule, if it were adopted by this court, must yield to a well-settled principle of law: namely, that courts will not rewrite a contract for the parties.'"); <u>State Farm Fire & Cas. Co. v. Paulson</u>, 756 P.2d 764, 769 (Wyo. 1988) (excluding coverage due to the existence of an anti concurrent-cause clause); <u>Schroeder v. State Farm Fire & Cas. Co.</u>, 770 F. Supp. 558, 561 (D. Nev. 1991) ("[W]e can see no public policy reason for disallowing parties to contract out of [the efficient proximate cause] doctrine."); <u>Millar v. State Farm Fire & Cas. Co.</u>, 804 P.2d 822, 826 (Ariz. Ct. App. 1990) (denying coverage based on the existence of an anti-efficient cause clause)). This Court predicts that the Supreme Court of South Dakota would follow the great weight of the authority to allow parties to contractually agree that the efficient proximate cause doctrine does not apply to certain exclusions in an insurance policy. The lead-in clause to the fungus exclusion in the Policy at issue precludes application of the efficient proximate cause doctrine to the fungus exclusion itself. Because the efficient proximate cause doctrine does not apply to the fungus exclusion and because the fungus exclusion is not ambiguous, Plaintiffs may not recover for any loss that would not have occurred in the absence of fungus, regardless of whether a covered peril was the efficient proximate cause of the loss.

The next issue for this Court is whether Plaintiffs' claims are completely barred by the fungus exclusion or other exclusions such that Defendant is entitled to summary judgment, or whether a genuine issue of material fact remains on what loss might be covered. The parties apparently conducted little discovery in this case[8] and thus argue their respective positions based

---

[8] The discovery deadline had passed. Doc. 25. Neither party filed an affidavit under Rule 56(f) to seek to forestall ruling on the summary judgment motion to allow for further discovery.

primarily on three sources of information:  (1) A field report from Plaintiffs' expert Irmiter, (2) excerpts from the transcript of Irmiter's deposition in the state court action Plaintiffs brought against DJ Construction and certain subcontractors, and (3) the report of Defendant's expert Lane. Plaintiffs characterize the loss generally as "water damage" and, at the hearing in this case, asserted that there was water damage causing damage that was not all fungal in nature.  Defendant counters that Plaintiffs are taking excerpts of their expert's report out of context and attempting to recharacterize as "water damage" a loss that truly is from fungus and mold.  Because neither party evidently deposed the other's expert and because neither party submitted an explanatory affidavit from their expert, this Court is left with reading Lane's report and Irmiter's report and the transcript from Irmiter's deposition in the state action to determine if there exists a genuine issue of material fact.

Specifically, in support of an argument in the alternative that the loss to the house consists of water damage independent of any fungal growth, Plaintiffs quote paragraphs 3.2.2, 3.2.3, 3.2.4, and 3.3.5 of Irmiter's report.  Doc. 37 at 6.  When read in its entirety, Irmiter's report is a summary and critique of the home's partial construction and an evaluation of the problems at the home. Irmiter does not attempt in the report or in his deposition to distinguish between water damage of a fungal nature and water damage not of a fungal nature.  Rather, his report is focused primarily on construction issues and the cause of the water damage resulting in mold growth.  The particular paragraphs of Irmiter's report cited by Plaintiffs have as their theme that high levels of moisture in the wood caused fungal decay which, in turn, requires replacement of the wood.

For instance, while paragraph 3.2.2 uses the term "water damage," the gist of the paragraph is that it is the wood decay fungi, rather than any "water damage," that requires removal and replacement of the trusses:

Water damage to the engineered floor trusses at the middle section of the home has severely compromised the subfloor and trusses. According to information printed directly on the truss design drawings the truss manufacture, Trus Wal Systems states, 'This component shall not be placed in any environment that will cause the moisture content of the wood to exceed 19% and/or cause connector plate corrosion.' Based on moisture readings taken at the trusses both by Geo-Tek Engineering and Testing Services and FBS, moisture content at a number of locations on the basement floor trusses exceeded this requirement.   The excessively high moisture content in the truss wood members, caused by continuous and long term exposure to rain, moisture from the unvented temporary heat in the winter months and the flooded basement during construction created a catastrophic condition which could have been avoided had proper construction sequencing and staging methods been used by the contractor. **The presence of wood decay fungi within the core of the truss framing members, caused by the water damage, particularly behind metal gusset plates and at top and bottom bearing chords, requires complete removal and replacement of the trusses.** In our opinion, failure to properly store, install and maintain the trusses in a dry service condition caused damaged [sic] to the trusses that cannot be corrected by cleaning or  encapsulating.

Doc. 36-6 at 11 (emphasis added).  Irmiter further documented the presence of fungus on the basement trusses in the "Collected Truss Data" document.  Doc. 30-9.  On each truss that Irmiter listed as having "water damaged" components, he visually identified the type of fungus on the truss.  Doc. 30-9.

Paragraph 3.2.3 immediately follows paragraph 3.2.2 of Irmiter's report.  While paragraph 3.2.3 does not discuss wood moisture content or "fungus," it uses the term "water damage" as if synonymous with fungus:

Similar water damage was observed in the attic assembly on sections of top chords and some truss struts. Photographs taken by the Owner during the construction sequencing show the roof trusses with the top chords in direct contact with the ground.  In our opinion, improper on site storage and covering of the roof trusses prior to installation caused the water damage to occur. Replacement of these trusses will be required.

18

Doc. 36-6 at 11.  During his deposition, Irmiter testified that the "Geotek report indicates that there's some fungal growth up in the attic assembly as well."  Doc. 41-1 at 3.

Like paragraph 3.2.2, paragraphs 3.2.4 and 3.3.5 of Irmiter's report discuss high wood moisture content.  Paragraph 3.2.4 provides:

> Tongue and groove plywood subfloor measuring 3/4 in thickness was used at the center section of the home.  The plywood was glued and pneumatically fastened to the floor trusses.  The plywood was heavily water damaged as viewed from the underside. Spot moisture readings at various locations recorded moisture content on both the surface and the core at over 16%.  Photographs taken by the Owner document that once the plywood subfloor was installed[,] the plywood was exposed directly to the outside weather from approximately Mid November 2007 until approximately August of 2008.  The Engineered Wood Association published guidelines for dry service wood moisture content of less than 16%.  The Plywood subfloor used at the Swenson Stewart home has an Exposure 1 rating.  According to the APA "Exposure 1 panels are suitable for uses not permanently exposed to the weather.  In our opinion, exposure to rain and snow . . . from November of 2007 until Late August of 2008 constitutes exposure to permanent weather.  According to APA Technical Bulletin TB-202 Controlling Decay in Wood Construction, 'In wood Construction, limiting moisture is the primary method of preventing decay fungi growth.  Proper design construction and maintenance is geared at keeping wood moisture content below the threshold which supports decay growth.'  **The methods chosen to construct the home did not maintain an acceptable moisture level in the subfloor.  Based on the testing by both Geo-Tek Engineering and Testing Services and FBS decay growth has occurred.  In our opinion replacement of the subfloor will be required.**  Damage to the subfloor extends under partition and support wall framing on the main floor.  The method used to fasten the subfloor to the trusses, in this case glue and nail will likely cause substantial damage to the top chords of the trusses requiring reengineering of the trusses.

Doc. 36-6 at 11-12 (emphasis added).

Paragraph 3.3.5 states:

Oriented Strand Board (OSB) sheathing measuring 7/16 was used on the exterior wall assemblies. Based on photos provid[ed] by the Owner during construction[,] exterior sheathing was generally covered immediately at the time of installation with Tyvek Home Wrap. The installation of the Tyvek covering began as early as July 1[,] 2008 and continued through the early winter months of 2008. However, large sections of framed walls and exposed wall sheathing were left open on the front elevation during the late fall and early winter of 2008. **During the inspection and testing conducted by FBS[,] wet wall sheathing requiring replacement was discovered on the home, particularly on the front elevation. Like the plywood products mentioned previously in this report[,] The Engineered Wood Association published guidelines for dry service wood moisture content of Exposure 1 rated OSB sheathing requires in service moisture content of less than 16%. Over 80% of the moisture readings taken by FBS at exterior sheathing locations registered higher than 16%.**

Doc. 36-6 at 12 (emphasis added). Irmiter testified in his deposition that because the OSB sheathing had "been wetted too much," the OSB began to delaminate, meaning that the wood flakes making up the OSB sheathing began to pull apart. Doc. 41-1 at 7. Paragraphs 3.2.4 and 3.3.5 are consistent with Irmiter's testimony that when moisture levels exceed 16% over a prolonged period of time, "fungal growth is going to start." Doc. 30-8 at 6.

Plaintiffs also refer to a section of Lane's report to suggest that there is "water damage" apart from mold. The first paragraph of Opinion No. 1 in Lane's report, however, does not support Plaintiffs' contention that the "water damage" they seek coverage for is a loss separate from fungal growth:

The moisture leakage into the interior of the Residence was caused by the failure of the General Contractor and the subcontractors to properly coordinate their respective construction means, methods, techniques, and sequences to control external moisture intrusion into the Residence. As a result of these failures, moisture intrusion into the interior of the Residence has occurred, and is continuing to occur over time. As a result of this moisture

20

> intrusion[,] atypical mold growth has occurred, and is continuing
> to occur, throughout the Residence.

Doc. 30-4 at 5.

Plaintiffs, in briefing to this, Court acknowledged that "water damage" is not severable from the mold damage by stating that "[i]t is impossible to distinguish the water damage from the mold damage." Doc. 43 at 8. Plaintiffs' expert Irmiter appears to have equated the water damage with the fungal issues. When answering a question about how he assesses "water damage," Irmiter testified that he was "specifically [ ] trained to identify two types of fungus. Both are associated with wood rot. One is a brown rot and one is a white rot fungus. And so what I was primarily looking—there's a bunch of aspergillus penicillin down there, the black stuff. That's pretty easy to identify." Doc. 30-8 at 10.

When a properly supported summary judgment motion is filed, the non-moving party may not rest on its allegations but must come forward with evidence establishing that a genuine issue of fact for trial exists. See Ryan v. Capital Contractors, Inc., 679 F.3d 772, 776 (8th Cir. 2012). Plaintiffs chose to argue that there was coverage for all water damage including fungus under the efficient proximate cause doctrine, did not present evidence to separate water damage from fungal damage, and filed a cross-motion for summary judgment on coverage asserting that there was fact question for trial. Plaintiffs' counsel, in answer to questions from this Court at oral argument about distinguishing mold damage from other "water damage," made only very generalized statements of there being other water damage besides mold and fungus. Plaintiffs' generalized assertion of "water damage" does not thereby give rise to a question of fact.[9]

---

[9] Defendant's Policy excludes coverage for "deterioration" and for "rot." Doc. 30-7 at 13. Defendant's Policy also excludes coverage for "defect, weakness, inadequacy, fault or unsoundness in . . . design, specifications, workmanship, construction, grading, compaction [and] materials used in

An instructive case is <u>Fiess v. State Farm Lloyds</u>, 202 S.W.3d 744 (Tex. 2006), in which

the Texas Supreme Court ruled that an ensuing loss provision that followed a fungus/mold

exclusion did not provide coverage for mold contamination resulting from water damage otherwise

covered under the policy. <u>Id.</u> at 750-53. The Texas Supreme Court in <u>Fiess</u> rejected the plaintiff's

argument that mold stemming from a roof and window leak constituted water damage: "We do

not think that a single phenomenon that is clearly an excluded risk under the policy was meant to

---

construction." Doc. 30-7 at 14-15. These exclusions—the "deterioration and wet or dry rot exclusion"
and the "negligent construction exclusion"—do not include an anti-efficient proximate cause doctrine
clause. Thus, the efficient proximate cause doctrine set forth in <u>Lummel v. Nat'l Fire Ins. Co.</u>, 210
N.W. 739 (S.D. 1926), allows coverage if a risk specifically insured against sets in motion an unbroken
sequence between the insured risk and the ultimate loss. <u>See</u> <u>TNT Speed & Sport Ctr., Inc. v. Am.</u>
<u>States Ins. Co.</u>, 114 F.3d 731, 733 (8th Cir. 1997). The clauses both contain "ensuing loss" language
as well, providing coverage for "any resulting loss . . . unless the resulting loss is itself a Loss Not
Insured." Doc. 30-7 at 14-15. There are cases where courts have rejected insurers' arguments that all
of a plaintiff's damage are subject to a fungus/mold exclusion. <u>See</u> <u>Hawkesworth v. Nationwide Mut.</u>
<u>Ins. Co.</u>, No. 2:10-cv-232, 2011 WL 2471747 at *5 (D. Me. June 21, 2011) (denying summary
judgment on defendant's claim that fungus exclusion precluded recovery because "Plaintiffs' original
complaint asserted that their property damage was the result not only of mold but also water penetration
as well as rot and dry rot. Defendant has not shown that property damage caused by water penetration
and/or rot are subject to the fungus exclusion. In fact, the summary judgment record contains no
information that would allow a fact finder to determine what, if any, casual relationship there was
between the water penetration and rot, mold and other water damage found in the [plaintiffs'] house");
see also <u>Boardwalk Condo. Assoc. v. Travelers Indem. Co.</u>, No. 03-cv-505, 2007 WL 1989656 at *7
(S.D. Cal. July 3, 2007) (holding that even if mold damage were excluded by policy as a matter of law,
summary judgment would still be inappropriate because plaintiff presented evidence that "some of the
costs incurred in repairing [the property] were for damage other than mold, such as water saturation and
staining. There is no evidence that [the insurer] attempted to apportion payment for damage attributable
to covered causes of loss (such as the water staining and saturation) from that attributable to excluded
causes (such as, according to [the insurer], mold)" (citations omitted)); <u>Malley v. Allstate Texas Lloyds</u>,
347 F. Supp. 2d 346, 350 (E.D. Tex. 2004) ("[T]here is no cause of action for mold damage under this
contract. Neither Plaintiff nor Defendant have alleged that the damage to the residence is solely mold
damage and nothing else. Defendants failed to address the water damage claim in their motion for
summary judgment. Plaintiff's experts expressly discuss water damage and have offered proposed
remediation and buildback estimates for water damage. Accordingly, summary judgment cannot be
granted on this issue."). However, here Plaintiffs presented this Court with no information from which
this Court could conclude that there is a genuine issue of material fact concerning what water damage
is excluded by the fungal exclusion and what other water damage could be covered.

become compensable because in a philosophical sense it can also be classified as water damage; it would not be easy to find a case of rot or dampness of atmosphere not equally subject to that label and the exclusions would become practically meaningless." Id. at 750. "[A] policy exclusion for 'mold,'" the Texas Supreme Court explained, "cannot be disregarded by simply deeming all mold to be 'water damage.'" Id. at 751.

Another instructive case is Boughan v. Nationwide Prop. & Cas. Co., NO: 10457, 2005 WL 126781 (Ohio Ct. App. 2005), in which the floor of the plaintiff's home experienced rot caused by water seepage through cracks in the home's brickwork. Id. at *1. The insurance policy at issue in Boughan contained exclusions for loss caused by wet or dry rot and settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floor, roofs, or ceilings. Id. at *3. The plaintiffs argued that the underlying cause of the damage to their home was water seepage through the brick, making the exclusions inapplicable. Id. The Boughan court rejected this argument, explaining

> [T]he [plaintiffs] are not attempting to recover for the water seepage, but for the cause of the seepage and the damage that resulted. Ultimately, the repairs they paid out-of-pocket were to repair the brickwork and the rotted floorboards, both of which are damages specifically excluded from coverage under the policy. In other words, both the underlying cause of the damage—the deterioration of the brickwork—and the ensuing loss—the rotted floorboard—are excluded from coverage. The [plaintiffs'] attempt to argue that the water seepage, an intermediary cause, is not excluded is an attempt to circumvent the plain language of the policy.

Id. at *4.

The loss that occurred here—infiltration of water due to construction being left only partially completed and poorly done compounded by the contractor's attempt to extract water in a way that left the partially constructed home replete with mold—is not a loss covered by the

23

policy. <u>See</u> Doc. 32-6; Doc. 32-7; Doc. 32-1. Under South Dakota law, a policy must be "examined as a whole," <u>Rumpza v. Donalar Enter., Inc.</u>, 1998 SD 79, ¶ 11, 581 N.W.2d 517, 520, and construed "according to the plain meaning of its terms." <u>Biegler v. Am. Family Mut. Ins. Co.</u>, 2001 SD 13, ¶ 20, 621 N.W.2d 592, 599. In doing so and mindful that neither party views there to be a question of fact, this Court concludes that the Policy provisions exclude coverage for Plaintiffs' claimed loss.

## IV. Conclusion

Therefore, for good cause, it is

ORDERED that Defendant State Farm Fire & Casualty Company's Motion for Summary Judgment (Doc. 27) is granted. It is further

ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 35) is denied.

Dated September __7__, 2012.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE